## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------- x
                                            :   Chapter 11
In re:                                      :
                                            :   Case No. 19-12269 (CTG)
MTE HOLDINGS LLC, et al.,¹                  :
                                            :   Jointly Administered
               Reorganized Debtors.         :
                                            :
-------------------------------------------------------------- x
                                            :
RPA ASSET MANAGEMENT SERVICES, LLC,         :
                                            :
               Plaintiff,                   :
                                            :
v.                                          :   Adv. Pro. No.: Refer to Summons
                                            :
MARK SIFFIN, MDC ACQUISITION LLC,           :
MAEFIELD DEVELOPMENT CORPORATION, and       :
MDCE INVESTMENTS LLC,                       :
                                            :
               Defendants.                  :
-------------------------------------------------------------- x
```

## COMPLAINT

Plaintiff RPA Asset Management Services, LLC (the "Trustee"), in its capacity as Trustee

of the MDC Litigation Trust (the "Trust"), files this Complaint against Defendants Mark Siffin

---

[1] The Reorganized Debtors in these Chapter 11 Cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: MTE Holdings, LLC ("MTE Holdings") (7894); MTE Partners, LLC ("MTE Partners") (1158); Olam Energy Resources I LLC ("Olam") (0770); MDC Energy LLC (9140); MDC Texas Operator LLC (1087); Ward I, LLC (6817); and MDC Reeves Energy LLC (3644). The Debtors' address is 280 East 96th Street, Suite 210, Indianapolis, Indiana 46240. On October 22, 2019, MTE Holdings filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. On October 23, 2019, MTE Partners and Olam filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. And on November 8, 2019 (the "Petition Date"), the remaining Reorganized Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. The bankruptcy cases were jointly administered under Case No. 19-12269.

("Siffin"), MDC Acquisition LLC ("MDC Acquisition"), Maefield Development Corporation ("Maefield"), and MDCE Investments LLC ("MDCE", and collectively with Siffin, MDC Acquisition, and Maefield, the "Defendants").

## A.  Nature of Case

1.      The Trustee brings this adversary proceeding to recover $23.5 million of fraudulent and/or preferential transfers made by Debtor MDC Energy LLC ("MDC Energy") to or for the benefit of Mark Siffin—who at the time of the transfers was MDC Energy's CEO and majority interest holder—and/or entities Siffin wholly owned or controlled in the months leading up to the filing of MDC Energy's bankruptcy petition.

2.      At Siffin's direction, MDC Energy transferred $23.5 million to MDC Acquisition, an entity Siffin wholly owned and controlled, as part of an undocumented "cash management" arrangement that was in fact a thinly-veiled effort to defraud secured lenders by placing MDC Energy's funds beyond their reach.  While a portion of the funds improperly transferred to MDC Acquisition was then apparently paid to certain MDC Energy trade creditors,[2] Siffin devised a scheme to keep a substantial portion of the money for himself.

3.      Siffin sought to justify his money grab through an ever-shifting series of accounting treatments and revised invoices, in which both the amount to be paid to Siffin and the justification for the payments changed numerous times.  After multiple iterations, and on the eve of MDC Energy's bankruptcy filing, Siffin settled on a final amount of $8.5 million of the fraudulently

---

[2] The Trustee separately has filed preference actions against certain trade creditors who may have been paid from funds Siffin caused MDC Energy to fraudulently transfer to MDC Acquisition. Pursuant to § 550 of the Bankruptcy Code, the Trustee will seek only one recovery of the fraudulently transferred funds but reserves all rights.

transferred funds that Siffin would retain as fees for nebulously-defined "services" he supposedly performed for MDC Energy.

4.    The descriptions of Siffin's purported services reflected on the "final" versions of the associated invoices—generated months after the services were supposedly rendered—indicate the services all related either to (i) proposed transactions that never closed and thus generated no benefit to MDC Energy, (ii) matters within the scope of Siffin's already existing responsibilities as MDC Energy's CEO, the performance of which provided Siffin no entitlement to payment of additional fees, or (iii) both.  Siffin used the misappropriated funds to finance his separate business activities, none of which provided any financial benefit or value to MDC Energy.

5.    The Trustee seeks to recover the $23.5 million fraudulently siphoned out of MDC Energy at Siffin's direction, including the $8.5 million that Siffin retained for his own personal benefit in violation of his fiduciary and other legal obligations, to the detriment of MDC Energy and its legitimate creditors.

## B.  Parties

6.    Plaintiff is the Trustee of the Trust created to, among other things, investigate, prosecute, settle, or otherwise resolve on MDC Energy's behalf actions pursuant to 11 U.S.C. §§ 547, 548, 549 and 550.  The Trustee has standing to assert all other claims set forth herein, as such claims constitute property of the Trust.[3]

---

[3] On September 3, 2021, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Sixth Amended Joint Chapter 11 Plan of Reorganization for MTE Holdings LLC and its Affiliated Debtors* [Doc. 2590] confirming the *Sixth Amended Joint Chapter 11 Plan of Reorganization for MTE Holdings LLC and its Affiliated Debtors* (the "Plan"). The Plan, among other things, established the MDC Litigation Trust, assigned and transferred to the Trust the MDC Litigation Trust Assets as defined by the Plan, and granted the Trust the authority, among other things, to investigate, prosecute, settle, or otherwise resolve such assets, including actions pursuant to 11 U.S.C. §§ 547, 548, 549 and 550, as well as all Litigation Claims of MDC

7.      Defendant Mark Siffin is an individual who, on information and belief, resides in Indianapolis, Indiana.   Siffin may be served with process at 280 East 96th St., Suite 210, Indianapolis, Indiana 46240.

8.      Defendant MDC Acquisition LLC is an Indiana limited liability company with its principal place of business at 280 East 96th St., Indianapolis, Indiana 46240.  MDC Acquisition may be served with process by serving its registered agent, Bob Quinn, 280 East 96th St., Suite 210, Indianapolis, Indiana 46240.

9.      Defendant Maefield Development Corporation is an Indiana for-profit corporation with its principal place of business at 280 East 96th St., Suite 210, Indianapolis, Indiana 46240. Maefield may be served with process by serving its registered agent, Mark A. Siffin, 280 East 96th St., Suite 210, Indianapolis, Indiana 46240.

10.      Defendant MDCE Investments LLC is an Indiana limited liability company with its principal place of business at 280 East 96th St., Suite 210, Indianapolis, Indiana 46240.  MDCE Investments may be served with process by serving its registered agent, Maefield Development, 280 East 96th St. Suite 210, Indianapolis, Indiana  46240.

## C.  Jurisdiction and Venue

11.      This adversary proceeding arises in and relates to the above-captioned  Chapter 11 bankruptcy cases.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This proceeding involves claims arising under Chapter 5 of the United States Bankruptcy Code, and such claims are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (F) and/or (H).  This

---

Energy and its affiliated entities MDC Reeves, LLC and Ward I, LLC.  (Doc. 2590-1, at 14; Doc. 2642-1, at 2.)

proceeding also involves claims arising under state law which, to the extent that such claims are non-core proceedings, the Court may hear pursuant to 28 U.S.C. § 157(c)(1). Venue is appropriate in this District pursuant to 28 U.S.C. § 1409. Pursuant to Local Bankruptcy Rule 7008-1, the Trustee states it consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### D.  Factual Background

**Overview of MDC Energy's Business and Ownership**

12.    MDC Energy was a privately-held exploration & production company formed by Siffin, which focused on the acquisition and development of oil and natural gas resources in the onshore United States—specifically, the Permian Basin in Texas. MDC Energy also possessed ancillary assets to dispose of wastewater generated in its oil and gas production activities. These assets were owned and operated by a wholly-owned subsidiary entity, which provided salt water disposal support for MDC Energy's exploration and production activities.

13.    MDC Energy is wholly owned by MTE Holdings, which was formed for the purpose of holding all membership interests of MDC Energy. Through a series of additional entities in the chain of ownership, Siffin indirectly owns a majority interest in MDC Energy and MTE Holdings.

14.    MDC Energy had no employees. Instead, through a Management Services Agreement (the "MSA"), Maefield—an entity owned and controlled by Siffin—provided management and related services to the company. Under the MSA, MDC Energy was to reimburse Maefield for the direct costs of providing these staffing services. The monthly payroll and benefits expense Maefield was reimbursed under the MSA for provision of personnel it employed on MDC

Energy's behalf was approximately $305,000.  The MSA did not provide for Maefield to receive any additional fees from MDC Energy for provision of these employees.  The MSA also allocated an annual payment of $50,000 for the cost of providing a CFO, Bob Quinn, to the company.

15.    Siffin had no employment agreement with MDC Energy providing him any entitlement to compensation for any work he undertook as the company's CEO.

**MDC Energy's Capital Structure**

16.    MDC Energy obtained financing for its operations though two loan arrangements, both executed on September 17, 2018.  The first of these was a Reserve Based Lending Credit Agreement entered between MDC Energy and Natixis, New York Branch (as Administrative Agent and Issuing Bank) (the "RBL Agreement").  Pursuant to the RBL Agreement, MDC Energy could borrow funds from Natixis and the other lenders under the RBL Agreement (the "MDC Lenders") against its oil and gas reserves.

17.    Loans under the RBL Agreement were secured by a Pledge and Security Agreement, also dated September 17, 2018, between the MDC Lenders and MDC Energy and other security instruments including mortgages and account control agreements that granted the MDC Lenders a security interest in substantially all of the assets of MDC Energy and its subsidiaries.  MDC borrowed approximately $60 million under the RBL Agreement.

18.    The second means for financing MDC Energy's operations was a Term Loan Credit Agreement between MDC Energy's parent, MTE Holdings, and a group of lenders (the "MTE Lenders," and collectively with the MDC Lenders, the "Lenders") for which Riverstone Credit Management LLC ("Riverstone") acted as administrative agent (the "MTE Credit Facility").  At the time of the MTE Credit Facility's execution, MTE Holdings drew $240 million in loaned funds. Subject to its terms and conditions, the MTE Credit Facility provided MTE Holdings potential

access to an additional $235 million in loans, or a total of $475 million.  Loans under the MTE Credit Facility were secured by a pledge and security interest in MTE's membership interests in MDC Energy, as well as MTE's own membership interests.

19.    Both the RBL Agreement and the MTE Credit Facility required execution of a Control Agreement concerning the bank accounts of MDC Energy and MTE Holdings.  The Control Agreement granted the Lenders the ability to sweep funds in MDC Energy's bank accounts in the event of a default under the RBL Agreement or the MTE Credit Facility.

**MDC Energy's Financial Difficulties, Insolvency, and Defaults**

20.    Shortly after execution of the RBL Agreement and MTE Credit Facility, the prices of oil and gas declined significantly.  At the same time, MDC Energy's oil and gas production was substantially below levels projected as of the time the RBL Agreement and MTE Credit Facility were executed.

21.    MTE Holdings and MDC Energy were in default under the RBL Agreement and the MTE Credit Facility within a matter of months of their execution.

22.    In order to secure access to further funds under the MTE Credit Facility, on or about February 22, 2019, MTE Holdings executed a Limited Waiver and First Amendment to the MTE Credit Facility, in which the MTE Lenders provided a limited waiver of disclosed existing defaults concerning MDC's leverage and interest coverage ratios and deviations from MDC's approved plan of development.

23.    In order to induce this waiver, Siffin, who executed the amendment on MTE's behalf, represented that no other events of default existed under the MTE Credit Facility or the RBL Agreement (default under which would itself constitute an event of default under the MTE Credit Facility).  In connection with the negotiation of the amendment to the MTE Credit Facility,

in February 2019, MTE Holdings also provided the MTE Lenders unaudited consolidated financial statements for the year ended December 31, 2018. These unaudited financial statements falsely represented MTE Holdings and MDC Energy's financial condition, as they omitted accrued liabilities in the amount of $114,243,461 for capital expenditures related to MDC Energy's drilling program.

24.     In reliance on Siffin's representations in the amendment to the MTE Credit Facility, the MTE Lenders advanced further funds to MTE. By mid-April 2019, MTE Holdings had drawn down a total of $410 million under the MTE Credit Facility.

25.     Audited 2018 financial statements, which MTE Holdings belatedly provided to the Lenders in July 2019, revealed the falsity of Siffin's representations in connection with the amendment of the MTE Credit Facility.

26.     Specifically, the audited 2018 financials—which included the $114 million in accrued capital expenditures that were omitted from the company-prepared financials MTE provided in February—demonstrated that, since 2018, MDC Energy and MTE Holdings had been substantially out of compliance with financial ratios mandated under the RBL Agreement and MTE Credit Facility (other than those that were the subject of the MTE Lenders' limited waiver of defaults in connection with the amendment to the MTE Credit Facility), as MDC Energy and MTE Holdings' current liabilities substantially exceeded their current assets. The financials also reflected that MDC Energy and MTE Holdings' total liabilities exceeded their total assets by approximately $100 million.

27.     Moreover, contrary to Siffin's representations in the amendment to the MTE Credit Facility, as of February 2019 and at all points thereafter, substantial additional defaults existed under the MTE Credit Facility and RBL Agreement, including (i) the existence of dozens of

mechanics' liens on MDC's assets and (ii) substantial MDC accounts payable that were more than 90 days past due.

28.     As of the Petition Date, MDC Energy had more than $161 million in past due payables to trade creditors that had remained outstanding for more than 90 days.

**MDC Energy's Fraudulent Transfers to MDC Acquisition**

29.     In a panicked response to MDC Energy's dire financial circumstances, during 2019, at Siffin's direction, MDC Energy made transfers totaling approximately $23.5 million to MDC Acquisition, an entity wholly owned and controlled by Siffin.  These transfers occurred as part of what MDC Energy's management characterized as an undocumented "cash management" function MDC Acquisition had assumed on behalf of MDC Energy, pursuant to which MDC Energy funded MDC Acquisition to pay MDC Energy's trade creditors.

30.     In fact, this "cash management" arrangement was a thinly-veiled attempt to place MDC Energy's funds outside the reach of the company's secured creditors, which, under the RBL Agreement and MTE Credit Facility, had the right to sweep MDC Energy's bank accounts based on ongoing defaults under both agreements.

31.     MDC Energy's transfers to MDC Acquisition were reflected in a 2019 MDC Transaction Table (the "Transaction Table")—a spreadsheet prepared by the company's CFO Bob Quinn shortly before the Petition Date.  In other words, Quinn prepared this table retrospectively to demonstrate the flow of funds between MDC Energy and MDC Acquisition for the entire 2019 calendar year.

32.     The Transaction Table reflects the actual amount of cash sent by MDC Energy to MDC Acquisition and the date the cash was sent.[4] As set forth in that document, MDC Energy sent the following cash payments to MDC Acquisition on the following dates:

- 2/1/2019 – $315,960.49
- 2/15/2019 – $197,169
- 2/27/2019 – $1,084,869.12
- 3/27/2019 – $337,548.78
- 4/19/2019 - $3,000,000
- 4/24/2019 – $264,733.44
- 5/29/2019 – $491,867.90
- 6/5/2019 – $2,022,500.99
- 6/5/2019 – $1,277,499.01
- 6/30/2019 – $327,107.06
- 9/6/2019 – $1,670,756.10
- 9/9/2019 – $329,243.90
- 9/23/2019 – $1,500,000
- 10/21/2019 – $9,101,439.79[5]
- 10/23/2019 – $561,754.84
- 10/28/2019 – $1,039,872.78

**Siffin's Improper Retention of $8.5 million of MDC Energy's funds.**

33.     Although some of the funds transferred to MDC Acquisition appear to have been used to pay MDC Energy's trade creditors, a substantial portion—$8.5 million—was not.  Instead, this money remained in MDC Acquisition and was not returned to MDC Energy.  It appears the funds were then siphoned out of MDC Acquisition by Siffin, allegedly as payment of fees associated with services Siffin purportedly provided to MDC Energy.  These alleged fees were

---

[4]  Certain of these payments were made from the account of MDC Energy's wholly-owned subsidiary, MDC Reeves, which is also a debtor in this bankruptcy, the Litigation Claims of which were transferred to the Trust.

[5]  Rather than being transferred directly from MDC Energy to MDC Acquisition, this particular payment represented funds that MDC Energy's customer, BML, Inc., paid to MDC Acquisition (with which it had no commercial relationship) instead of to MDC Energy (to which the funds were owed).

paid pursuant to a series of invoices prepared between April and November 2019, of which there are multiple versions featuring changing payment amounts and justifications.

34.     The first version of a consulting fee invoice for $2.5 million was attached to an email from the CFO Quinn to MDC Energy's Chief Operating Officer, Paul Cyphers, on April 11, 2019.   The cover email from Quinn explained that the fee was to be credited against "the commission at closings."   The invoice itself was dated April 11, 2019, and purported to charge $2.5 million for "services related to ETC and WaterBridge transactions"—a proposed oil offtake transaction with a company called ETC and a proposed transaction for sale of an interest in MDC Energy's potential salt water disposal business to an entity called WaterBridge.   Neither the ETC transaction nor the WaterBridge transaction ever closed.

35.     On April 15, 2019, Quinn sent an email to Cyphers attaching another version of the invoice, which had been "increased per Mark [Siffin]" to $3 million for "services related to [the] ETC and WaterBridge transactions"—again, potential transactions that never closed.

36.     On April 19, 2019, $3 million was transferred from MDC Energy's accounts to MDC Acquisition.

37.     On June 5, 2019, Quinn sent an email to Cyphers attaching an invoice for $3.3 million.   The subject line of the email reads "3.3."   At the bottom of the email chain, Quinn asked Cyphers to "please send by tomorrow AM." Cyphers responded, copying Siffin, that he "[j]ust spoke with Mark" and that the money would be treated as "deal commission for WaterBridge and/or the SAF refi."   The attached invoice was dated June 5, 2019, and purported to charge a fee of $3.3 million for "services related to SAF and WaterBridge transactions."   The SAF transaction referenced in this version of the invoice and the transmittal email pertained to a potential

refinancing of the company's debt.   Like the ETC and WaterBridge transactions, the SAF transaction never occurred.

38.     On June 5, 2019, a total of $3.3 million was transferred from MDC Energy's accounts to MDC Acquisition, which promptly used the funds to make a debt payment in connection with Siffin's 20 Times Square Project—a real estate project pursued by Maefield that was wholly unrelated to MDC Energy's business and in which MDC Energy had no financial interest.

39.     The rationale for the transfer of $6.3 million of MDC Energy's funds to MDC Acquisitions in April and June 2019 continued to evolve as the Petition Date grew near.   On July 16, 2019, MDC Energy's controller, Jason Galindo, emailed Cyphers, stating that he still needed to "[a]djust [the] April financials to reflect reclass of expense to loan for the $3MM payment to Maefield."

40.     On July 17, 2019, Cyphers noted in an email that he was "making one last change to the financials on the $3MM to Maefield" because "Mark agreed to treat as prepaid payroll, rather than a loan. . . ."  Cyphers continued, "TBD on the June payment – I think it will be prepaid either way, but he may want that to be prepaid commission / transaction expense related to the recap."

41.     On July 29, 2019, Galindo sent Cyphers an email regarding the $3.3 million paid to MDC Acquisition in June 2019. The subject line of the email read "$3.3MM to Maefield – June."  In this email, Galindo inquired of Cyphers:  "The June disbursements to Maefield are going to be loaned funds correct?"  Cyphers responded that Galindo should "[s]tick them in prepaid – we will have to figure out if it is a loan coming back to MDC or if it will end up being prepaid commission as of the deal close."

42.     During this time period, Cyphers and Quinn referred to Siffin in their email correspondence as a "pirate" because Siffin had instructed MDC Energy to wire money out to MDC Acquisition to maintain Siffin's control of the funds in the face of mounting trade creditor claims and a potential sweep of the company's accounts by the Lenders.

43.     On November 8, 2019—the Petition Date, and months after the April and June payments discussed above—Quinn sent Cyphers an email entitled "Invoices."  The email attached three invoices from MDC Acquisition. The first invoice was dated April 11, 2019, and purported to charge $4,000,000 for "services related to ETC and WaterBridge transactions" and "Vendor and Loan management" for January 2019 through April 2019.  The second invoice was dated June 30, 2019 and purported to charge $3,000,000 for "services related to vendor and loan management" between May 2019 and June 2019.  The third invoice was dated July 30, 2019, and purported to charge $1.5 million for "services related to vendor and loan management" for July 2019.

44.     The third invoice attached to Quinn's November 8, 2019 email was the first indication of any fees purportedly earned by Siffin in July 2019.   Unlike the April and May invoices, there was no contemporaneous documentation of the July fee, nor any corresponding transfer of money from MDC Energy to MDC Acquisition at that time.  Instead, it appears this invoice, and the corresponding service fee amount, were invented out of whole cloth at the time the Petition was filed to account for the funds remaining with MDC Acquisition and provide Siffin a fig leaf explanation for retaining those funds rather than returning them to MDC Energy where they belonged.

45.     There is no written agreement between MDC Energy and Siffin or MDC Acquisition to provide any services to MDC Energy.  Apart from the invoices and associated email traffic summarized above, there is no documentation whatsoever of any such agreement.

46.     Likewise, there is no evidence that MDC Energy had, at any point in its history prior to the 2019 financial travails leading to its bankruptcy, paid any person or entity fees for interfacing with the company's vendors or lenders—much less the millions of dollars of fees purportedly paid to Siffin for a few months of such services prior to the Petition Date.  Instead, MDC Energy's personnel, staffed and paid for under the MSA, provided all such services.

47.     There is likewise no documentation reflecting how the amount paid for Siffin's supposed services was determined or that any such determination occurred before the funds were paid.  Rather, documents created close to the Petition Date propose the retrospective allocation of fees to justify the payments.

48.     On November 6, 2019, Quinn sent an email to Cyphers attaching a chart entitled "MDC transaction sheet."  Cyphers forwarded the email to Galindo on November 8, 2019.  In the email chain, Quinn explained that he "added a timetable on booking the transaction fees by month (bottom row)."  The attached table contains a row proposing a fee structure of $750,000 per month between January and June 2019, $1,000,000 per month for July and August 2019, and $1.1 million per month for September and October 2019 for a total of $8.7 million.

49.     Quinn's Transaction Table, discussed above, provided yet another proposed allocation of fees paid to MDC Acquisition for Siffin's supposed services to MDC Energy.  Specifically, the Transaction Table shows fee charges of $1 million per month between January and April 2019 and charges of $1.5 million per month between May and July 2019.

50.     Thus, it was not until at or near the Petition Date that Siffin decided how much of the money transferred to MDC Acquisition in 2019 he would keep as payment for his supposed services.

51.     There is no basis to conclude that MDC Energy received any value—much less reasonably equivalent value—for the $8.5 million retained by Siffin's entities.   None of the WaterBridge, ETC, or SAF transactions, which served as a basis for the fees in the various drafts of the invoices, closed.   Moreover, at all relevant times, Siffin was MDC Energy's CEO, in furtherance of which role Siffin was obligated to (i) get involved as required to enable the continuation of the company's operations and (ii) pursue whatever economic opportunities presented themselves for the development of the company's business.  Siffin thus had a preexisting legal obligation to provide whatever services allegedly justified his $8.5 million pay day.

**Subsequent Transfers of Siffin's Ill-Gotten Gains.**

52.     Siffin used the $8.5 million of MDC Energy funds purportedly paid to MDC Acquisitions as fees for Siffin's services to fund Siffin's business outside of MDC Energy. As noted above, at least $3.3 million was transferred to Maefield to fund unrelated real estate projects.

53.     An additional $1.5 million was transferred to MDCE Investments LLC ("MDCE Investments"), an investment company wholly owned and controlled by Siffin.

## CAUSES OF ACTION

### COUNT I - FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548(A)(1)(A)

54.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

55.     Pursuant to § 548(a)(1)(A) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

56.     As set forth above, mere months before the Petition Date, Siffin directed and caused MDC Energy to transfer to Siffin's wholly-owned company MDC Acquisition at least $23.5 million.[6]

57.     There are creditors of MDC Energy and its affiliates with allowable claims against MDC Energy and its affiliates that were in existence at the time of the transfers.  The subject transfers were made by and/or at Siffin's direction with actual intent to hinder, delay, or defraud MDC Energy's then existing and future creditors, including the Lenders.

58.     As set forth above, MDC Energy's fraudulent intent in this instance is evidenced by the following factors: (i) the transfers were made to an insider of MDC Energy; (ii) the transfers were concealed or effectuated via fraud (including but not limited to fraudulent statements to the Lenders to secure funding and to place outside the Lenders' reach assets that should have been available to repay borrowed funds); (iii) the transfers were effectuated to remove or conceal the assets from MDC Energy's legitimate creditors, including but not limited to the Lenders; (iv) at least as it pertains to the $8.5 million in MDC Energy funds retained by MDC Acquisition as fees for Siffin's alleged services, the value of the consideration received by MDC Energy, if any, was not reasonably equivalent to the value of the transfers; (v) MDC Energy was insolvent or became insolvent shortly after the transfers were made; (vi) the transfers occurred shortly after MDC Energy and its affiliates incurred substantial debt; and (vii) MDC Energy engaged in a pattern of sharp dealing prior to the Petition Date.

59.     Accordingly, the Trustee requests that the Court avoid as fraudulent transfers under § 548(a)(1)(A) the $23.5 million transferred by MDC Energy to MDC Acquisition in 2019,

---

[6] As noted previously, these transfers included amounts transferred by MDC Energy's wholly-owned subsidiary MDC Reeves.  *See* n.4, *supra*.

inclusive of the $8.5 million of such funds retained by MDC Acquisition or transferred to the other

Defendants, all of whom are direct, intermediate, or subsequent transferees of MDC Energy.

## COUNT II - FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548(A)(1)(B)

60.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

61.     Pursuant to § 548(a)(1)(B) of the Bankruptcy Code, a trustee may avoid any transfer

of an interest of the debtor in property that was made or incurred on or within two years before the

date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a

reasonably equivalent value in exchange for such transfer and was insolvent on the date that such

transfer was made or became insolvent as a result of such transfer.

62.     As set forth above, within months of the Petition Date, at Siffin's direction, MDC

Energy made transfers to Siffin's wholly-owned company MDC Acquisition for purported services

Siffin provided to MDC Energy.  MDC Energy obtained no reasonably equivalent (or any) value

for the services because (i) the alleged services related to potential transactions that never closed

and thus provided no value to MDC Energy and/or (ii) to the extent Siffin provided any services

at all, he was under a pre-existing legal obligation to provide the services in his role as CEO of the

company.

63.     Further, both before and after the transfers at issue, MDC Energy was insolvent and

unable to pay its debts as they became due.

64.     Accordingly, the Trustee requests that the Court avoid as fraudulent transfers under

§ 548(a)(1)(B) the $8.5 million transferred by MDC Energy to MDC Acquisition and retained by

MDC Acquisition or transferred to the other Defendants, all of whom are direct, intermediate, or

subsequent transferees of MDC Energy.

## COUNT III - PREFERENTIAL TRANSFER UNDER 11 U.S.C. § 547.

### (Plead in the alternative to Counts I and II)

65.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

66.     Pursuant to § 547 of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property that was made or incurred on or within one year before the date of the filing of the petition, if (i) the debtor made the transfer to or for the benefit of a creditor, (ii) the transfer was for or on account of an antecedent debt purportedly owed by the debtor before the transfer, (iii) the debtor was insolvent, and (iv) such creditor was an insider.

67.     Defendants were insiders of MDC Energy because (i) Siffin was an officer and director of MDC Energy and (ii) Siffin directly or indirectly controlled MDC Energy, MDC Acquisition, Maefield, and MDCE.

68.     The transfer of $23.5 million from MDC Energy to MDC Acquisition described above was on account of a purported antecedent debt of MDC Energy—namely, fees for services Siffin allegedly provided to MDC Energy and trade creditor obligations of MDC Energy.

69.     Both before and after the transfers at issue, MDC Energy was insolvent and unable to pay its debts as they came due.

70.     Accordingly, the Trustee requests that the Court avoid as improper preferential transfers under § 547 the $23.5 million transferred by MDC Energy to MDC Acquisition and retained by MDC Acquisition or transferred to the other Defendants, all of whom are direct, intermediate, or subsequent transferees of MDC Energy.

## COUNT IV - VIOLATIONS OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT

71.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

72.     The Texas Uniform Fraudulent Transfer Act ("TUFTA"), codified as chapter 24 of the Texas Business and Commerce Code, permits the recovery of the value of any transfers made with "actual intent to hinder, delay, or defraud any creditor of the debtor" as well as those made "without receiving a reasonably equivalent value in exchange for the transfer or obligation." Tex. Bus. & Com. Code Ann. § 24.005.[7]  Transfers made within four years of the Petition Date may be avoided.  *Id.* at § 24.006.  TUFTA defines transfers fraudulent as to present or future creditors as follows:

(a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1)  with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code Ann. § 24.005.

73.     Section 544(b) of the Bankruptcy Code allows the Trustee to avoid a transfer of MDC Energy's interest in property that is voidable under applicable law—in this case, TUFTA.

---

[7]  The Trustee contends that, because MDC Energy's principal place of business was Texas and the transfers injured MDC Energy and, by extension, creditors who provided goods and services to MDC Energy in Texas, Texas law has the most significant relationship to the transactions at issue.  To the extent that the Court determines that Delaware law has the most significant relationship by virtue of MDC Energy's formation there, the Trustee is entitled to—and hereby seeks in the alternative—the same relief under Delaware law, which, like Texas, has also adopted the Uniform Fraudulent Transfer Act.  *See* 6 Del. Code Chapter 1305.

Section 550 of the Bankruptcy Code allows the Trustee to recover the property transferred or the value of the property transferred in violation of §§ 544, 547, and 548.

74.     The transfers from MDC Energy to Siffin's company MDC Acquisition described herein were fraudulent as to MDC Energy's present and future creditors and in violation of TUFTA, as set forth above.

75.     Further, Tex. Bus. & Com. Code Ann. § 24.006 defines transfers fraudulent as to present creditors as follows:

> (a)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b)   A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code Ann. § 24.006.

76.     The transfers to MDC Energy insiders and their affiliates as described herein are likewise in violation of § 24.006 of TUFTA.

77.     Defendants are liable as the recipient transferees of these funds or the persons for whose benefit the transfers were made.  These transfers were intentional and initiated by MDC Energy acting at Siffin's direction, as he served as MDC Energy's CEO, controlled the company's management, indirectly constituted MDC's majority interest holder, and caused MDC Energy to make the transfers.

78.     Accordingly, the Trustee respectfully requests that the Court avoid the subject transfers as actual and/or constructive fraudulent transfers under § 544(b) and applicable Texas

state law, and permit the Trustee to recover the value of the transferred property pursuant to § 550 of the Bankruptcy Code from Defendants, all of whom are direct, intermediate, or subsequent transferees of MDC Energy.

## COUNT V - RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550

79.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

80.     Section 550 of the Bankruptcy Code allows the trustee to recover, for the benefit of the estate, the property or the value of the property transferred and avoided under §§ 544, 547, and 548 from (i) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (ii) any immediate or mediate transferee of such initial transferee.

81.     Here, as set forth above, the Trustee is entitled to avoid, under §§ 544, 547 and/or 548, transfers of $23.5 million.

82.     Defendants are direct, intermediate, or subsequent transferees of MDC Energy.

83.     Thus, pursuant to § 550 of the Bankruptcy Code, the Trustee is entitled to recover the amounts transferred to Defendants as avoided as fraudulent and/or preferential transfers.[8]

## COUNT VI - ALTER EGO AND/OR PIERCING THE LIMITED LIABILITY VEIL

84.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

85.     Siffin exercised his control over MDC Energy to such a degree that MDC Energy operated as nothing more than Siffin's tool or business conduit.  Evidence of such domination includes, among other indicia, causing MDC Energy to transfer tens of millions of dollars to

---

[8]   As noted previously, the Trustee has initiated adversary proceedings against certain trade creditors who are believed to be subsequent transferees of a portion of the $23.5 million transferred from MDC Energy to MDC Acquisition in 2019 on grounds that such transfers were avoidable preferential transfers.  To the extent any portion of the transfers to MDC Acquisition the Trustee seeks to avoid through Counts I, II, or III herein are recovered from such subsequent transferees, the Trustee acknowledges that any such recovered amounts are not recoverable from MDC Acquisition in this proceeding.

Siffin's wholly-owned affiliate, MDC Acquisition, as part of an undocumented "cash management" arrangement undertaken to defraud MDC Energy's creditors.

86.     Siffin used this domination of MDC Energy inequitably and to the detriment of MDC Energy and its legitimate creditors by, among other actions, preventing MDC Energy from paying its legitimate debts while diverting its assets for the benefit of Siffin and his wholly-controlled business entities.

87.     Further, Siffin used his control to cause MDC Energy to defraud its creditors by, inter alia, entering into contracts or otherwise incurring obligations that MDC Energy could not or would not perform or fulfill and by falsely representing MDC Energy's financial condition as an inducement to the counterparties in such transactions.

88.     At the time that these misrepresentations were made, both MDC Energy and Siffin knew or should have known that such representations were false.  Siffin directed MDC Energy to make such false representations with the intent that MDC Energy's creditors rely and act upon them.  As a result of such fraudulent activity, MDC Energy and its affiliates incurred hundreds of millions of dollars in debt that they were unable or unwilling to repay.

89.     Pursuant to both the law of Texas—the state where the transactions and wrongful conduct at issue occurred—and Delaware—MDC Energy's state of formation—Siffin is personally liable for such fraudulently incurred obligations.

## COUNT VII – BREACH OF FIDUCIARY DUTY

90.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

91.     At all relevant times, Siffin was the CEO and a director of MDC Energy.  In such capacity, Siffin owed MDC Energy the highest fiduciary duties recognized in the law, including duties of loyalty and care.

92.     Siffin breached his fiduciary duties by causing MDC Energy, among other things, to transfer funds for Siffin's own personal benefit, thereby enriching Siffin and damaging MDC Energy.

93.     The Trustee, which stands in the shoes of MDC Energy, is legally entitled to both (i) recover all damages sustained by MDC Energy as a result of Siffin's wrongful conduct and (ii) disgorgement of Siffin's ill-gotten gains.

## COUNT VIII—UNJUST ENRICHMENT

94.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

95.     To the extent Defendants received fraudulent transfers as alleged herein, each of those transfers conferred a benefit on the Defendant that received it, and such Defendant unjustly retained the benefit at the expense of MDC Energy and its creditors.

## COUNT IX—CONSPIRACY AND/OR AIDING AND ABETTING FRAUDULENT TRANSFERS AND BREACHES OF FIDUCIARY DUTY

96.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

97.     Defendants conspired with each other and other persons to perpetrate, facilitate, and perpetuate the breaches of fiduciary duty, fraudulent transfers, and other wrongful acts alleged herein and aided and abetted the commission of all such wrongs.

98.     Defendants undertook substantial overt acts, as alleged in detail above, in furtherance of the conspiracies alleged herein and are each jointly and severally liable for all associate damages and harm to MDC Energy and its legitimate creditors.

## COUNT X—WASTE

99.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

100.    The transfers of assets made to and retained by Defendants alleged herein constituted waste of MDC Energy's assets that served no rational business purpose and was commercially unreasonable.

101.    As a result of the waste of MDC Energy's property, Defendants are liable jointly and severally liable for the damages associated therewith.

**COUNT XI—DISALLOWANCE OF CLAIMS UNDER 11 U.S.C. § 502(d) AND (j)**

102.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

103.    Defendants are persons and entities from which property is recoverable under 11 U.S.C. § 550 of the Bankruptcy Code.

104.    Defendants are transferees of transfers avoidable under 11 U.S.C. §§ 547, 548, and/or 544(b) and relevant state law as alleged herein.

105.    Defendants have not paid the amount of the transfers, or turned over such property for which Defendants are liable under § 550 of the Bankruptcy Code.

106.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendants against the Trustee, MDC Energy, or the estate of MDC Energy must be disallowed until such time as the Defendants pay to the Trustee an amount equal to the aggregate amount of all the transfers, plus interest thereon and costs.

107.    Pursuant to 11 U.S.C. § 502(j), any and all claims of Defendants and/or their assignees against the Trustee, MDC Energy, or the estate of MDC Energy that were previously allowed must be reconsidered and disallowed until such time as Defendants pay to the Trustee an amount equal to the aggregate amount of all the transfers.

## PRAYER

108.    For these reasons, the Trustee asks for judgment against Defendants for the following:

(a)   actual damages;

(b)   exemplary damages;

(c)   pre-judgment and post-judgment interest on all amounts recovered in this adversary proceeding;

(d)   reasonable attorneys' fees;

(e)   court costs;

(f)   disallowance of any claims by Defendants and/or their assignees; and

(g)   all other legal and equitable relief to which the Trustee is entitled.

Dated: November 5, 2021
Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*/s/ Jason A. Gibson*
Frederick B. Rosner (DE #3995)
Scott J. Leonhardt (DE #4885)
Jason A. Gibson (DE #6091)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Telephone: 302-777-1111
rosner@teamrosner.com
leonhardt@teamrosner.com
gibson@teamrosner.com

*Counsel to RPA Asset Management
Services, LLC, Trustee of the MDC
Litigation Trust*